## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| ADRIAN FOWLER and KITIA HARRIS, on behalf of themselves and others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>RUTH JOHNSON, in her official capacity as Secretary of State of the Michigan Department of State<br><br>    Defendant. | Case No. 17-11441<br><br>CLASS ACTION<br>JURY DEMANDED |

## CLASS ACTION COMPLAINT

### Introduction

1.      This case is about the Michigan Department of State running a wealth-based driver's license suspension scheme that traps some of the state's poorest residents in a cycle of poverty.  The Secretary of State automatically and indefinitely suspends the driver's licenses of people who owe court-ordered fines, costs, fees, and assessments, even if they simply cannot afford pay.  Without driver's licenses, people already facing the harsh realities of owing court debt while living in poverty face additional hurdles of being unable to drive to and from work, get their children to daycare, keep medical appointments, and care for their family members.

2.      Although Michigan's automatic suspension of driver's licenses is designed to coerce payment, for people who are *unable* to pay, Michigan's practice will never accomplish its intended goal; no incentive or punishment will increase the likelihood of a person paying a debt if she does not have the money.  Penalizing people for being unable to pay court debts violates the Equal Protection Clause of the Fourteenth Amendment, the Due Process guarantee of fundamental

1

fairness, Plaintiffs' right to intrastate travel, and longstanding Supreme Court precedent.  Michigan has trapped Plaintiffs in an inescapable cycle of poverty by suspending their licenses, thereby narrowing or eliminating their job opportunities and impeding their ability to take care of their children and obtain necessary medical treatment.

3.      The Secretary of State indefinitely suspends the driver's licenses of people who fail to pay court-ordered fines, costs, fees, and assessments, even where nonpayment is solely due to indigence and thus not willful.  *Mich. Comp. Laws Ann.* § 257.321a(2).  Individuals who cannot afford to pay their court debts after their licenses have been suspended must also pay a driver's license clearance fee of $45 before the suspension is lifted, and this figure may multiply if an individual owes multiple debts.  *Mich. Comp. Laws Ann.* § 257.321a(5)(b).  Anyone who is caught driving with a suspended license (DWLS) because of failure to pay court costs faces an additional 30-day suspension and must pay a reinstatement fee of $125.  *Mich. Comp. Laws Ann.* §§ 257.904 and 257.320e.  Additionally, under MCL 257.732a, anyone guilty of a DWLS misdemeanor before October of 2018 owes a Driver Responsibility Fee of up to $1,000 over two years.  *Mich. Comp. Laws Ann.* §§ 257.732a(2) and (11).

4.      Over the last three years, Michigan has assessed approximately $40 million in Driver Responsibility fees, and over 100,000 people have lost their driver's licenses simply because they are too poor to pay court costs and fines.  *See* Exhibit 6, FOIA Response.  These suspensions deprive some of Michigan's poorest residents of their only reliable means of transportation to and from work, further diminishing their ability to meet their court-ordered financial obligations.

5.      By and through their attorneys, on behalf of themselves and others similarly situated, Plaintiffs seek declaratory and injunctive relief against Defendant Ruth Johnson in her

official capacity as Secretary of the Michigan Department of State to end this unconstitutional wealth-based suspension scheme because it violates the Due Process and Equal Protection Clauses of the United States Constitution.

## **<u>Nature of the Action</u>**

6.     The Michigan Department of State automatically suspends the driver's licenses of people who fail to pay court-ordered fines, costs, fees, and assessments, even if they are unable to pay the debts.  Plaintiffs seek declaratory and injunctive relief prohibiting this wealth-based suspension scheme.

7.     Defendant violates Plaintiffs' substantive due process rights because it is fundamentally unfair to suspend their driver's licenses for their failure to pay court debts that they are unable to pay.

8.     Defendant violates Plaintiffs' substantive due process rights because Plaintiffs have a fundamental right to both interstate and intrastate travel, and without meaningful alternatives to driving, the lack of a valid license necessarily impedes those rights without being narrowly tailored to a compelling government interest.

9.     Defendant violates Plaintiffs' equal protection rights because the state's suspension scheme lacks any rational basis.  Suspending the driver's licenses of people too poor to pay court debt has a demonstrably negative effect on a person's ability to pay court debts, thus directly undermining the only possible governmental interest.

10.    Defendant violates Plaintiffs' equal protection rights because automatic driver's license suspensions constitute an extraordinary collection effort.

11.    Defendant violates Plaintiffs' procedural due process rights because Plaintiffs have a property interest in their driver's licenses that cannot be denied without notice and a hearing.

## Jurisdiction and Venue

12.     This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, *et seq.*, and the Fourteenth Amendment to the United States Constitution.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

13.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

14.     Plaintiff Adrian Fowler is a 31-year-old resident of Detroit, Michigan.  Exhibit 1, Fowler Decl.  She lives with her three-year-old daughter.  *Id.*  Ms. Fowler's Michigan driver's license is currently suspended because she owes at least $2,121 for unpaid traffic tickets and fines. She cannot afford to pay her court debt.  *Id.*

15.     Plaintiff Kitia Harris is a 25-year-old resident of Detroit, Michigan.  Exhibit 2, Harris Decl.  She lives with her eight-year-old daughter.  *Id.*  Ms. Harris's Michigan driver's license is currently suspended because she owes $276 for unpaid traffic tickets, fines, and fees.  *Id.* She cannot afford to pay her court debt.  *Id.*

16.     Defendant Ruth Johnson is the Secretary of State for the State of Michigan.

17.     Ms. Johnson is sued in her official capacity as Secretary of State.

18.     As Secretary of State, Ms. Johnson indefinitely suspends driver's licenses of individuals who cannot afford to pay court costs.  *See* "Failure to Appear in Court/Failure to Comply with Judgment," *Department of State*, http://www.michigan.gov/sos/0,4670,7-127-1627_8665_9074-25061--,00.html (last visited Apr. 6, 2017).

19.     At all times relevant to the events, acts, and/or omissions alleged in this Complaint, Secretary Johnson has acted under color of state law, pursuant to her authority and responsibility as an official of the State of Michigan.

## Factual Allegations

**A.    Introduction**

20.    The State of Michigan enforces, through the Secretary of State, suspensions of the driver's licenses of people who fail to pay their tickets for traffic and parking violations.

21.    These suspensions apply to all those who fail to appear in court or fail to comply with a court order, including failure to pay any court-ordered fines, fees, costs, and assessments. *See Mich. Comp. Laws Ann.* § 257.321(a)(2).

22.    The Secretary of State can suspend licenses on her own initiative or in response to notification from a court that an individual has failed to pay court debt.

23.    The Secretary of State imposes suspensions under MCL 257.321(a)(2) for failure to pay regardless of the reason for nonpayment and with no consideration of whether the person has the financial means to pay.

24.    A valid driver's license is essential for people to secure and maintain employment, and the loss of a license often results in further financial hardship for individuals and their families.

25.    Research has consistently found that having a driver's license can be necessary to maintain a job, pursue educational opportunities, and care for dependent relatives.  *See* "Letter to Colleague" from Vanita Gupta & Lisa Foster, U.S. Department of Justice (Mar. 14, 2016), https://www.justice.gov/crt/file/832461/download.

26.    On information and belief, each year since at least 2010, the Secretary of State has suspended more than 100,000 licenses for failure to pay court debts.

27.    On information and belief, hundreds of thousands of people in Michigan currently have a suspended license for nonpayment of court debts.

28.    Suspended licenses can trap people who are poor in an impossible situation: they

cannot afford to reinstate their licenses without steady employment, but they are unable to work without a license.

29.    Paying off court debt is particularly difficult for the 1.5 million people living below the federal poverty line in Michigan. "Michigan 2016," *Talk Poverty*, https://talkpoverty.org/state-year-report/michigan-2016-report/ (last visited May 4, 2017).

30.    At a ranking of 36 out of 50, Michigan is among the worst states for overall poverty rate. In 2015, 15.8% of Michigan's residents were living below the federal poverty line. "Quick Facts: Michigan," *U.S. Census Bureau*, https://www.census.gov/quickfacts/table/PST045216/26 (last visited May 4, 2017).

31.    Suspending licenses as a means of debt collection also puts public safety at risk, because law enforcement resources are devoted to stopping, investigating, and prosecuting suspended drivers who do not present a danger behind the wheel instead of pursuing individuals who do.

**B.    Plaintiffs' Debts**

32.    Named Plaintiffs Adrian Fowler and Kitia Harris are both residents of Detroit, Michigan, who received tickets for minor traffic offenses and, because they are unable to pay the full amounts that they owe to the courts, have had their driver's licenses suspended indefinitely.

**i.    Adrian Fowler**

33.    Adrian Fowler is a 31-year-old resident of Detroit, Michigan. Exhibit 1, Fowler Decl.

34.    Ms. Fowler has a three-year-old daughter, for whom she is the sole caretaker. *Id.*

35.    Ms. Fowler works for X-Men Security, earning $8.90 per hour, *id.*, the current minimum wage in Michigan. *Dep't of Licensing and Regulatory Affairs*,

http://www.michigan.gov/lara/0,4601,7-154-11407_32352-140972--,00.html (last visited Apr. 10, 2017). With about 20 hours of work each week, Ms. Fowler's monthly income is approximately $712. Exhibit 1, Fowler Decl.

36.    From 2008 until 2012, Ms. Fowler lived in Cobb County, Georgia. *Id.* During those years, she acquired three tickets for traffic civil infractions. *Id.* She has not been able to pay any of her Georgia tickets. *Id.*

37.    In 2012, after moving back to Michigan, Ms. Fowler attempted to renew her driver's license and discovered that it had been suspended because she had not paid her Georgia court debts. *Id.*

38.    In the winter of 2013, Ms. Fowler's then-infant daughter developed a fever of 103 degrees while Ms. Fowler was at work. *Id.* Ms. Fowler feared severe delays if she relied on emergency vehicle services because of an ice storm that had hit the city. *Id.* With the life of her infant daughter potentially at stake, Ms. Fowler drove home to take her baby to the hospital despite the fact that her license was still suspended. *Id.* Unsurprisingly, Ms. Fowler's rush to care for her daughter resulted in a police officer stopping her for speeding in Ferndale. *Id.* The officer was sympathetic to Ms. Fowler's emergency need and allowed her to continue driving so that she could get her daughter to the hospital, but he still cited her for driving while her license was suspended (DWLS) as well as issuing her a speeding ticket. *Id.* The total cost was almost $600. *Id.*

39.    When Ms. Fowler went to the Ferndale courthouse to tell them that she would not be able to pay the $600, she was told that if she did not return in three weeks with the full amount, a warrant would be issued for her arrest. *Id.* She was further told that if she returned without the full amount, she would be arrested. *Id.*

40.    Ms. Fowler believes that she has current warrants for her arrest in Ferndale,

Eastpointe, and Oak Park for missed court dates. *Id.* The Ferndale warrant carries an additional fee of $500. The Eastpointe and Oak Park warrants carry additional fees of $800 each. *Id.*

41.     Ms. Fowler currently owes a total of at least $2,121 to the courts of Ferndale, Eastpointe, and Oak Park. *Id.*

42.     Ms. Fowler pays $850 per month for rent and an additional $500 to $600 monthly for utilities, groceries, and other everyday needs for herself and her young daughter. *Id.* She earns only about $712 each month from her current part-time job, which falls far short of covering her expenses. *Id.* There is no hope that Ms. Fowler will be able to pay the $2,121 to get her license back in the foreseeable future. *Id.*

43.     Meanwhile, Ms. Fowler's ability to find better-paying employment and thus increase her ability to pay her court debt is severely hampered by her license suspension. *Id.*

44.     Because she cannot drive legally, Ms. Fowler is unable to take a job outside the city of Detroit in the surrounding suburbs. *Id.* Jobs in the suburbs tend to be higher-paying than city jobs. *Id.*; *see also* Noah Urban, "Uphill Both Ways: Where are the Jobs in Metro Detroit?" *Data Driven Detroit*, http://datadrivendetroit.org/economy/uphill-both-ways-where-are-the-jobs-in-metro-detroit/ (analyzing data from the Census Bureau's Longitudinal Employer-Household Dynamics Program).

45.     In her most recent job search in April of 2017, Ms. Fowler struggled to find a job within the city that paid well, and she ended up with a minimum-wage, part-time position that does not even cover her basic monthly expenses. *See* Exhibit 1, Fowler Decl.

46.     Ms. Fowler was forced to turn down a position with Blue Chip Endeavors that paid a wage of $12.50 per hour, well above the wage offered by X-Men Security, because the position would have required her to travel throughout the metropolitan area, something she cannot do

without a valid license, as there is no viable public transportation option that connects the suburbs to the city of Detroit.  *Id.*; *see also* Exhibit 4, Herson-Hord Decl.

### ii.   Kitia Harris

47.     Kitia Harris is a 25-year-old resident of Detroit.  *See* Exhibit 2, Harris Decl.

48.     Ms. Harris has an eight-year-old daughter for whom she is the sole caretaker.  *Id.*

49.     In November of 2014, Ms. Harris was diagnosed with interstitial cystitis, a chronic medical condition that makes Ms. Harris unable to work.  *Id.*

50.     Ms. Harris was most recently employed at Blue Cross Blue Shield in Rochester Hills, Michigan.  *Id.*  She was fired after about four months on the grounds that her medical condition, which she had disclosed to her employer, was interfering with her ability to perform her work.  *Id.*  She has not worked since losing this job in December of 2015.  *Id.*

51.     In July of 2016, Ms. Harris was approved for disability benefits.  *Id.*  She receives a total of $1,218 per month in disability benefits ($938 for herself and $280 for her daughter).  *Id.*

52.     On October 26, 2016, Ms. Harris was cited for "impeding traffic" in Ferndale, Michigan.  *Id.*  She was charged a total of $150 for the ticket.  *Id.*  She was not able to pay the $150.  *Id.*

53.     After receiving notices that her payment was due and being unable to pay, Ms. Harris received a notice in the mail that her driver's license had been suspended.  *Id.*

54.     Ms. Harris currently owes a total of $276 to get her license reinstated ($150 for the original ticket, $81 in penalties accrued for nonpayment, and a $45 license clearance fee).  *Id.*

55.     Ms. Harris pays $600 per month in rent for the apartment that she shares with her daughter.  *Id.*  She pays approximately $400 for utilities and other monthly essentials.  *Id.*

56.     Ms. Harris needs her driver's license to attend her regular medical appointments,

usually every two weeks and sometimes more often.  *Id.*  Her doctor's office is a 30-minute drive from her home.  *Id.*

57.     Ms. Harris is unable to take the bus not only because the service is woefully inadequate but also because her medical condition — which is not a visible disability — makes it unsafe for her to stand for more than a few minutes.  *Id.*  Instead, she must pay people she knows to drive her where she needs to go.  *Id.*

58.     Because she cannot drive herself due to her license suspension, Ms. Harris is frequently late to her medical appointments and often has to cancel or reschedule when no one is available to drive her.  *Id.*

**C.      Michigan Runs a Wealth-Based Driver's License Suspension Scheme that Traps Poor Residents in a Cycle of Poverty**

**i.      Assessment of Fines, Fees, and Costs**

59.     For civil infractions, if a civil fine is ordered, the judge can also order costs of up to $100.  *Mich. Comp. Laws* § 257.907(4).

60.     For each civil infraction determination, in addition to any civil fines or costs ordered, a mandatory justice system assessment of $40 must be paid (except for parking violations or when the fine and cost total $10 or less).  *Mich. Comp. Laws* § 257.907(13).

61.     A penalty fee of 20% is applied to any costs, fees, penalties, or civil violations that have not been paid 56 days after the amount is due.  *Mich. Comp. Laws* §§ 600.4801, 600.4803.

62.     The amounts assessed or the time granted for payment do not vary according to a person's financial resources, other financial obligations, or the hardships timely payment will impose upon the person or the person's family.

**ii.     Defendant Suspends the License of Anyone Who Fails to Pay All Court Debts, Regardless of the Reason for Nonpayment**

63.     A person who fails to comply with an order or judgment of the court, including failure to pay all fines, costs, fees, and assessments, "is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $100.00, or both." *Mich. Comp. Laws Ann.* § 257.321a(1).

64.     When a person has failed to pay court debts after 28 days or more, the court gives notice that if the person fails to pay within another 14 days, the Secretary of State, Defendant Johnson, will suspend her license. *Mich. Comp. Laws Ann.* § 257.321a(2).

65.     If the person fails to comply within the second 14-day period, the court informs the Secretary of State. *Id.*

66.     Upon receiving the information from the court that the person has failed to pay, the Secretary of State — Defendant Johnson — immediately suspends the license of the person and notifies the person of the suspension. *Id.*

67.     The court does not make any inquiry into the reason for nonpayment or a person's financial status or ability to pay before issuing notice that the person faces license suspension if she does not pay within 14 days.

68.     The court does not make any inquiry into the reason for nonpayment or a person's financial status before informing the Secretary of State that the person has failed to pay court debts.

69.     Defendant Johnson does not make any inquiry into the reason for nonpayment or a person's financial status before immediately suspending the license of the person.

70.     Defendant Johnson does not make any inquiry into the reason for nonpayment or a person's financial status after suspending the license of the person.

**iii.      Defendant Will Not Reinstate a License Suspended for Nonpayment of Court Debts Until the Person Has Paid a $45 Fee in Addition to All Court Debts Owed**

71.     A driver's license suspension imposed for failure to comply with a court order or judgment, including payment of all fines, costs, fees, and assessments, is indefinite; it must remain in effect until the person whose license was suspended has paid the fine or cost as well as at least one $45 driver license clearance fee.  *Mich. Comp. Laws Ann.* § 257.321a(5).

72.     Each court in which a person failed to pay a fine or cost must notify the Secretary of State that the person has paid the debt.  *Id.*

73.     The person whose license was suspended must pay the court a $45 driver license clearance fee *for each failure* to pay a fine or cost.  *Id.*

74.     Of each $45 driver license clearance fee, $15, or one-third, is disbursed to the Secretary of State for state general funds to defray costs of suspension and reinstatement actions. *Mich. Comp. Laws Ann.* § 257.321a(11).

75.     Another third, $15, is disbursed to the treasury of the county (for circuit court matters), the district funding unit for the court (for district court matters), or the city (for municipal court matters).  *Id.*

76.     The final $15 third is disbursed to the juror compensation reimbursement fund.  *Id.*

**iv.     A Person Who Drives While Her License Is Suspended Faces an Additional Period of Suspension, a Reinstatement Fee, and a Driver Responsibility Fee**

77.     A person whose license has been suspended for any reason, including failure to pay court debts, is prohibited from "operat[ing] a motor vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles."  *Mich. Comp. Laws Ann.* § 257.904(1).

78.     Any person who violates this prohibition is guilty of a misdemeanor punishable by up to 93 days' imprisonment or a fine of up to $500 or both for the first violation, and, for subsequent violations, up to one year's imprisonment or a fine of up to $1000 or both.  *Mich.*

*Comp. Laws Ann.* § 257.904(3).

79.     In addition to the misdemeanor punishments above, a person who drives while her license is indefinitely suspended due to failure to pay court debts is subject to a mandatory additional 30-day period of suspension imposed by Defendant unless it is the first such offense in the person's lifetime.  *Mich. Comp. Laws Ann.* §§ 257.904(11) and (18).

80.     Anyone whose license has been suspended due to a violation of the prohibition on driving while one's license is suspended (DWLS) must pay a reinstatement fee of $125 to the Secretary of State before her license can be reinstated.  *Mich. Comp. Laws Ann.* § 257.320e(1).

81.     Additionally, anyone whose license has been suspended due to a DWLS violation must pay a Driver Responsibility Fee.  *Mich. Comp. Laws Ann.* § 257.732a(2)(b)(iii).

82.     For violations that occurred before October 1, 2015, the Driver Responsibility Fee for DWLS is $500 per year for two years.  *Mich. Comp. Laws Ann.* § 257.732a(2)(b)(iii).

83.     For violations that occurred on or after October 1, 2015, and before October 1, 2016, the Driver Responsibility Fee for DWLS is $500 for the first year and $250 for the second year.  *Mich. Comp. Laws Ann.* § 257.732a(11)(b)(i).

84.     For violations that occur on or after October 1, 2016, and before October 1, 2018, the Driver Responsibility Fee for DWLS is $500 for the first year only.  *Mich. Comp. Laws Ann.* § 257.732a(11)(b)(ii).

85.     For violations that occur on or after October 1, 2018, and before October 1, 2019, the Driver Responsibility Fee for DWLS is $250 for the first year only.  *Mich. Comp. Laws Ann.* § 257.732a(11)(b)(iii).

86.     Only for violations that occur on or after October 1, 2019, is there no fee.  *Mich. Comp. Laws Ann.* § 257.732a(11)(b)(iv).

87.     People with DWLS violations are excepted from the provision that allows for community service in lieu of a Driver Responsibility Fee; a Driver Responsibility Fee imposed for a DWLS violation cannot be paid in community service.  *Mich. Comp. Laws Ann.* § 257.732a(4)

**v.      License Suspensions Drive People Further into Poverty and Invite Further Infractions**

88.     Michigan's wealth-based suspension scheme imposes significant hardship on individual debtors and their families, often forcing them to choose between paying for survival resources such as food, shelter, health care, and clothing, or paying their court costs and fines.

89.     Because of their inability to pay monetary penalties, low-income drivers are over-represented in the pool of suspended drivers when compared to their representation in the larger population of licensed drivers.

90.     A valid driver's license is essential for people to secure and maintain employment, get to and from medical and other appointments, and otherwise provide for themselves and their families.  *See* Exhibit 5, Simmons Decl.

91.     Not having a valid driver's license can be a direct barrier to employment opportunities.  "Not all jobs require a driver's license, particularly those that pay very low wages. But having one is a very common requirement for the sorts of job that can actually lift people out of poverty."  Alana Semuels, "No Driver's License, No Job," *The Atlantic* (June 15, 2016), https://www.theatlantic.com/business/archive/2016/06/no-drivers-license-no-job/486653/.

92.     Without the ability to drive, most jobs are inaccessible to people living in rural parts of Michigan, and even in urban areas, getting to and from work without the ability to drive is extremely challenging and time-consuming, if it is possible at all.

93.     Detroit's bus system is completely unreliable as a means of regular commute to and from work.  In many cases, getting to or from work can be a 90-minute to two-hour process if

transfers are involved.  The buses run very infrequently, and a single transfer can add up to an hour of waiting to the trip.  *See* Exhibit 4, Herson-Hord Decl.

94.    People living in Detroit who must take the bus to work frequently lose their jobs because they cannot consistently arrive on time, as buses are often late and sometimes do not arrive at all.  *Id*; *see also* Exhibit 5, Simmons Decl.

95.    Indeed, a rigorous study of New Jersey drivers found that 42% of drivers lost their jobs after their driving privileges were suspended.   Jon A. Carnegie, Ian M. Voorhees Transportation Center, Rutgers, The State University of New Jersey, *Driver's License Suspensions, Impacts and Fairness Study* 56 (2007), http://www.nj.gov/transportation/refdata/research/reports/FHWA-NJ-2007-020-V1.pdf.

96.    Of those drivers, 45% were unable to find new employment.  *Id.*

97.    Of those that were able to find another job, 88% reported a decrease in income.  *Id.*

98.    In many cases, Michigan's wealth-based suspension scheme forces suspended drivers to choose between driving illegally and losing their jobs.

99.    In Michigan, driving on a suspended license is a criminal offense, with a violation that occurs after a prior conviction carrying up to twelve months of imprisonment, a $1,000 fine, or both.  *Mich. Comp. Laws Ann.* § 257.904(3)(b).

100.    Thus, Michigan's wealth-based suspension scheme creates a downward spiral from poverty to criminal culpability: an unpaid civil infraction ticket triggers automatic suspension, which often leads to the misdemeanor of driving while one's license is suspended.

101.    The high cost of losing a driver's license inevitably results in an impossible choice: drive — and risk being charged with driving while suspended, which itself can lead to additional costs, fines, and periods of incarceration — or refrain from driving and lose access to gainful

employment and medical care.

### vi.   Detroit's Urban Sprawl and Lack of Adequate Public Transportation Exacerbate the Hardships of Living Without a License

102.    Detroit's public transit system is notoriously inadequate for a major metropolitan area.  Detroit provides only 11.3 transit rides per capita, by far the lowest compared to other cities with comparable populations.  Reuben Fischer-Baum, "How Your City's Public Transit Stacks Up," *FiveThirtyEight* (July 31, 2014) https://fivethirtyeight.com/datalab/how-your-citys-public-transit-stacks-up/.

103.    Although Detroit ranks eighth nationally in percentage of households without cars, the region spends only $69 per capita annually on transit, compared to $119 in Atlanta, $177 in Cleveland, and $471 in Seattle.  Henry Grabar, "Can America's Worst Transit System Be Saved?" *Slate* (June 7, 2016), http://www.slate.com/articles/business/metropolis/2016/06/detroit_has_america_s_worst_transit_system_could_the_regional_transit_master.html.

104.    Detroit's bus system is widely disparaged among residents.  "In metro Detroit, public transportation is a bunk concept; most riders, with no hesitation, will offer a similar refrain when asked their opinion: They hate it. It's a sick joke; ride a bus long enough and you'd surely hear a horror story."  Ryan Felton, "How Detroit Ended up with the Worst Public Transit," *Detroit Metro Times* (Mar. 11, 2014), *available at* http://www.metrotimes.com/detroit/how-detroit-ended-up-with-the-worst-public-transit/Content?oid=2143889.

105.    Even during rush hour, the buses rarely arrive more than once every half-hour.  Grabar, *supra*.

106.    Detroit is the most decentralized metro employment center in the United States, with over 77 percent of jobs located outside the urban core of the city.  *Elizabeth Kneebone, Brookings Institution, Job Sprawl Stalls: The Great Recession and Metropolitan Employment*

*Location* 8 (2013), *available at* https://www.brookings.edu/wp-content/uploads/2016/06/Srvy_JobSprawl.pdf.

107. The typical commute distance for a Detroiter is 10.4 miles. *Elizabeth Kneebone & Natalie Holmes*, *Brookings Institution*, *The Growing Distance Between People and Jobs in Metropolitan America* 20 (2016), *available at* https://www.brookings.edu/wp-content/uploads/2016/07/Srvy_JobsProximity.pdf.

108. The majority of Detroit jobs are held by commuters who live outside the city. In 2011, only 27.3 percent of the jobs within the city of Detroit were held by residents of Detroit, and these commuters are far more likely than Detroiters to have higher-earning jobs. Noah Urban, "Uphill Both Ways: Where are the Jobs in Metro Detroit?" *Data Driven Detroit*, http://datadrivendetroit.org/economy/uphill-both-ways-where-are-the-jobs-in-metro-detroit/ (analyzing data from the Census Bureau's Longitudinal Employer-Household Dynamics Program).

109. Detroit's surrounding suburbs contain five times as many employment opportunities as the city of Detroit, and over 43 percent of these suburban jobs are in the highest wage category. *Id.*

110. For people living in Detroit, the higher-paying jobs that can be found in the suburbs are completely inaccessible without a driver's license because public transportation between the city and the suburbs is extremely limited. *See* Exhibit 4, Herson-Hord Decl; *see also* Exhibit 5, Simmons Decl.

111. The Detroit Department of Transportation (DDOT), which services the city of Detroit, does not run in the suburbs or between the city and suburbs. *See* Exhibit 4, Herson-Hord Decl. The Suburban Mobility Authority for Regional Transportation (SMART) services the

suburbs and runs into the city primarily to make stops in midtown and downtown Detroit — the city's wealthiest areas.  *Id.*  With only a few exceptions at certain times of day, SMART buses do not pick up or drop off riders in the city of Detroit outside the downtown and midtown locations. *Id.*

112.    Detroiters who live outside the wealthy midtown and downtown areas cannot take SMART buses into the suburbs without first getting to the downtown or midtown pickup locations or waiting for a long period at the edge of the city on 8 Mile Road and enduring multiple transfers. *Id.*

113.    Moreover, many poor Detroiters who work in the suburbs have service-industry jobs that require irregular hours outside the typical nine-to-five workday.  Both DDOT and SMART have scaled back their services outside regular rush hours, which results in extremely infrequent service for people who need to travel to and from work at irregular hours.  Weekend service also runs on a low-frequency schedule, further complicating the transportation options for people who must work weekend hours.  *Id.*

114.    The Regional Transit Authority's most recent attempt to build a public transportation system that connects the city and the suburbs failed in November of 2016, defeated by voters in Oakland and Macomb Counties.  Frank Witsil & Eric D. Lawrence, "RTA Millage Rejected by Metro Detroit Voters," *Detroit Free Press* (Nov. 9, 2016), *available at* http://www.freep.com/story/news/local/michigan/detroit/2016/11/09/rta-regional-transit-authority-millage/93535602/.

115.    Detroit's education system further complicates transportation for people with children.  More than half of the city's schools are charter schools that provide no coordinated transit for their students.  *See* Exhibit 4, Herson-Hord Decl.   The increase in charter schools has

resulted in the closure of many neighborhood public schools, so parents often have to transport their children to schools in areas of the city that are far from their homes.  *Id.*  For parents with children who are too young to ride the public buses on their own, getting their children to school without a car is extremely difficult.  *Id.*

116.    The inadequacy of Detroit Metro's public transportation system imposes a disproportionate hardship on people with disabilities.  While existing buses are compliant with the Americans with Disabilities Act, there are not enough buses to meet the needs of people with mobility limitations.  *Id.*   People who cannot walk the distance to the nearest bus stop must make arrangements through a private company several days in advance, and they often have to wait two to four hours beyond their requested pickup or drop-off time.  *Id.*

**D.    Michigan's Wealth-Based Suspension Scheme Violates Plaintiffs' Equal Protection and Due Process Rights**

117.    Defendant's indefinite suspensions of Plaintiffs' driver's licenses because of their inability to pay court debts violated their constitutional rights under the Equal Protection and Due Process Clauses.

**i.    Defendant's Wealth-Based Suspension Scheme Violates Due Process Because It Lacks Fundamental Fairness**

118.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

119.    The Due Process Clause prohibits the state from subjecting individuals to processes and penalties that fail to comport with principles of due process and fundamental fairness.

120.    Michigan violates due process by suspending Plaintiffs' driver's licenses because penalizing people for failing to pay court debts that they cannot afford is fundamentally unfair.

19

*See, e.g.*, *Bearden v. Georgia*, 461 U.S. 660, 660 (1983) (holding that it is fundamentally unfair to revoke probation because a probationer is unable to pay fines and restitution); *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (holding that it is fundamentally unfair to deny access to an appeal solely because of inability to pay court costs); *Tate v. Short*, 401 U.S. 395, 395 (1971) (holding that it is fundamentally unfair to jail a person for inability to pay a fine); *Williams v. Illinois*, 399 U.S. 235, 240–41 (1970) (holding that it is fundamentally unfair to imprison a person beyond the maximum period fixed by statute solely because he cannot pay fines or court costs).

121.    Michigan suspends driver's licenses without first determining whether the nonpayment was willful or whether the person was simply unable to pay due to indigence.

122.    Michigan's statutory scheme requires courts to inform Defendant Johnson if a person does not pay court debts within 42 days, without inquiry into the reasons for nonpayment or consideration of whether timely payment would result in hardship to the person or to the person's family.  *Mich. Comp. Laws Ann.* § 257.321a(2).

123.    The Secretary of State enforces Michigan's wealth-based suspension scheme without considering the debtor's ability to pay or offering any alternatives.

124.    Thus, Michigan's wealth-based suspension scheme inevitably results in individuals being punished for their inability to pay.

125.    By converting a relatively modest penalty (*e.g.*, a $150 traffic fine) into a serious deprivation (an indefinitely suspended driver's license), Michigan unfairly penalizes people who are poor simply for being poor.

126.    Punishing a person solely for her inability to pay violates principles of due process and fundamental fairness.

127.    Accordingly, Defendant's wealth-based suspension scheme violates the Due

Process Clause.

> **ii.      Defendant's Wealth-Based Suspension Scheme Violates Due Process Because It Infringes on Plaintiffs' Fundamental Right to Travel**

128.    Plaintiffs have a fundamental due process right to intrastate travel. *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002) (holding that the Due Process Clause of the Fourteenth Amendment protects the "right to travel locally through public spaces and roadways."); *see also Cole v. City of Memphis*, 839 F.3d 530, 535 (6th Cir. 2016).

129.    Plaintiffs live in a region with woefully inadequate public transportation.

130.    Plaintiffs cannot afford to pay for taxis or other car services for daily commuting and living.

131.    Due to Michigan's weather conditions and the fact that the Plaintiffs have to get their children to day care, non-motorized modes of transport, such as walking or biking, are not feasible alternatives.

132.    Thus, Plaintiffs' only reliable form of transportation is to drive a personal vehicle.

133.    Defendant has suspended Plaintiffs' driver's licenses simply because they are unable to pay their debts and therefore has impeded Plaintiffs' fundamental right to intrastate travel.

134.    Because it implicates a fundamental liberty interest, Defendant's suspension scheme must be narrowly tailored to achieve compelling state objectives.

135.    Defendant's suspension scheme is not limited in scope; it is a broad prohibition on all driving in all locations at all times in all circumstances for an indefinite period.

136.    While the collection of court-ordered debt is a significant state interest, suspending the driver's licenses of those who cannot pay is not narrowly tailored to collection.  Indeed, it is counterproductive because it hampers Plaintiffs' abilities to make a living and pay their essential

21

expenses, thus decreasing their ability to pay court debts.

137.    Accordingly, Defendant's wealth-based suspension scheme violates the Due Process Clause.

### iii. Defendant's Wealth-Based Suspension Scheme Violates Equal Protection Because It Discriminates Against Poor People Without a Rational Connection to a Legitimate State Purpose

138.    The Due Process Clause protects against arbitrary and capricious government action even when the decision to take action follows adequate procedures.

139.    A person has protected property and liberty interests in a driver's license and its attendant government-sanctioned ability to drive.  *See Bell v. Burson*, 402 U.S. 535 (1971); *see also Sanderson v. Village of Greenhills*, 726 F.2d 284, 286 (6th Cir. 1984).

140.    Michigan's wealth-based suspension scheme is not rationally related to any legitimate government objective because suspending driver's licenses impedes lower-income workers from obtaining or maintaining employment in order to meet their financial obligations to the court.

141.    Driver's licenses are often essential in the pursuit of a livelihood, and their suspension threatens important interests of the people who hold them and also prevents their ability to pay courts debts.  In other words, the state's practice undermines the state's only goal.

142.    The purpose of licensing drivers is to promote safety on Michigan's roads and highways by keeping dangerous drivers off the roads.

143.    Suspending licenses directly undercuts any ability the state would have to recover payments from indigent residents by depriving such residents of any means of employment. Indigent residents would be better able to pay their courts debts if they had their driver's licenses.

144.    For poor debtors, avoidance of driver's license suspension does not operate as an

incentive to pay when they must choose between paying the court and paying rent, buying medication, feeding their families, and other necessary expenses.

145.    Indeed, for people who lack the ability to pay court debt, driver's license suspension as coercion to pay is not only irrational but fundamentally counterproductive; suspension makes it less likely — rather than more likely — that people will be able to pay court debt. *See* John S. Hausman, "Driving Up Fees: Muskegon County Deals (or Not) with Michigan's Driver Responsibility Fees," *Michigan Live* (Feb. 6, 2013), http://www.mlive.com/news/muskegon/index.ssf/2013/02/driving_up_fees_muskegon_count_1.html (describing efforts to avoid mandatory Driver Responsibility Fees because they hinder, rather than help, municipal efforts to regulate driving).

146.    The loss of a license often means the loss of reliable transportation to and from work, which makes debtors less able to meet their financial obligations to the court. *Id.*

147.    Michigan's wealth-based suspension scheme violates the Due Process Clause of the United States Constitution because it causes substantial hardship to poor drivers and bears no rational relationship to any legitimate government objective.

### iv.    Defendant's Wealth-Based Suspension Scheme Violates Equal Protection Because It Constitutes Extraordinary Collection

148.    The United States Supreme Court has held that when governments seek to recoup the costs of prosecution from indigent defendants, they may not take advantage of their position to utilize unduly harsh methods of debt collection solely because the debt is owed to the government and not to a private creditor. *See James v. Strange*, 407 U.S. 128 (1972).

149.    Fines are imposed as a penalty for unlawful behavior; similarly, restitution, is imposed to compensate a victim.  In contrast, court costs are assessed to subsidize court operations and thus are ordinary private consumer debts incurred for services rendered.

23

150.    When a private creditor seeks to enforce a judgment against a debtor via garnishment or lien, the law provides procedural and substantive protections for poor debtors against deprivation of certain basic necessities and the ability to maintain a livelihood.

151.    The private creditor may coerce payment only to the extent permitted by those protections.  Michigan's wealth-based suspension scheme does not treat indigent defendants, to the extent that they owe court costs, like other judgment debtors.

152.    Michigan's wealth-based suspension scheme provides for suspension of the debtor's driver's license and the possibility of imprisonment.

153.    When the State of Michigan, through Defendant's actions, takes advantage of the machinery of government to peremptorily strip debtors of their driver's licenses, it executes a form of coercion not available to private creditors for debts unrelated to driving.  Thus, it denies debtors who owe court costs the procedural and substantive statutory protections that other Michigan debtors may invoke against a private creditor in ordinary debt collection proceedings.

154.    Michigan's wealth-based suspension scheme fails to offer poor debtors even a modicum of the substantive and procedural protections that prevent private creditors from stripping the debtor of the ability to maintain a livelihood and meet her basic needs.

155.    The State of Michigan's severe and coercive collection policies and practices constitute invidious discrimination and violate the fundamental principle of equal protection of the laws embedded in the United States Constitution.

### v.    Defendant's Wealth-Based Suspension Scheme Violates Procedural Due Process Because It Does Not Guarantee an Ability-to-Pay Hearing

156.    A person's driver's license is recognized as a property interest that may not be taken away without due process of law.  *See Bell v. Burson*, 402 U.S. 535 (1971); *see also Sanderson v. Village of Greenhills*, 726 F.2d 284, 286 (6th Cir. 1984)

157.     Due Process requires the State of Michigan to conduct ability-to-pay inquiries at each stage in a case, including the point at which it proposes to take coercive action to punish nonpayment.

158.     As described above, the State's wealth-based suspension scheme imposes mandatory costs without consideration of ability to pay.  Instead, Defendant Johnson suspends a person's driver's license upon learning from a court that that person has failed to pay court debts. *Mich. Comp. Laws Ann.* § 257.321a(2).

159.     Prior to suspending a debtor's driver's license, Defendant provides no notice to the debtor of her right to an ability-to-pay determination evaluating her present financial condition.

160.     Moreover, Defendant conducts no independent review of the debtor's ability to pay before or after enforcing the harsh punishment of suspension.

161.     The purpose of the State's wealth-based suspension scheme is to coerce payment, not to protect public safety on the roads.  Therefore, Plaintiffs are entitled to pre-deprivation notice and a hearing prior to license suspension.

162.     There is currently no hearing under Michigan law for those facing driver's license suspension for unpaid court debt, creating a high risk that an indigent debtor will be deprived of her driver's license for reasons directly attributable to her poverty.

163.     The high risk of deprivation created by Defendant's automatic, indiscriminate driver's license suspension system violates the Due Process Clause of the United States Constitution.

## Class Action Allegations

164.     The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, to assert the claims alleged in this Complaint on a common basis.

165.    A class action is a superior means, and the only practicable means, by which the named Plaintiffs and unknown Class Members can challenge Defendant's unlawful wealth-based suspension scheme.

166.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(l)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

167.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

168.    Plaintiffs propose one Class seeking declaratory and injunctive relief. The Declaratory and Injunctive Class is defined as: all Michigan residents whose driver's licenses are currently suspended or will be suspended solely because of inability to pay court debts, including, but not limited to, traffic fines, court costs, assessments and fees.

## A.    Numerosity — Fed. R. Civ. P. 23(a)(1)

169.    On information and belief, over 100,000 Michigan residents have their licenses suspended each year for inability to pay court debts.

170.    In 2010 alone, the Secretary of State suspended 397,826 licenses for failure to pay and failure to appear.  *Am. Assoc. of Motor Vehicle Administrators*, *Best Practices Guide to Reducing Suspended Drivers* 65 (2013), *available at* http://www.aamva.org/WorkArea/linkit.aspx?LinkIdentifier=id&ItemID=3723&libID=3709.

## B.    Commonality — Fed. R. Civ. P. 23(a)(2)

171.    The relief sought is common to all Class Members, and common questions of law and fact exist as to all Class Members.  The named Plaintiffs seek relief concerning whether the automatic suspensions scheme violates the rights of the Class Members and relief mandating that Defendant end the scheme so that the constitutional rights of the Class Members will be protected

in the future.

172.   These common legal and factual questions arise from one scheme: Defendant's automatic suspensions based on inability to pay court debts. The material requirements of the suspension statutes do not vary from Class Member to Class Member, and the resolution of these legal and factual issues will determine whether all Class Members are entitled to the relief they seek.

173.   Among the most important, but not the only, common questions of fact are:

- Whether Michigan has a policy and practice of penalizing people who are poor more harshly than wealthy people for failing to pay court debt;
- Whether Michigan, acting by and through the Defendant, has a policy and practice of suspending driver's licenses without conducting meaningful inquiries into the ability of a person to pay before taking such action; and
- Whether Michigan, acting by and through the Defendant, exploits its governmental status to avail itself of forms of enforcement in the collection of court debts not available to most private civil creditors.

174.   Among the most important, but not the only, common questions of law are:

- Whether fundamental principles of Due Process and Equal Protection require Michigan to take into account the ability of a person to pay court costs and fines;
- Whether suspending a person's driver's license solely because she cannot afford to make a monetary payment toward court costs and fines previously imposed is lawful;
- Whether a person is entitled to a meaningful inquiry into her present ability to pay court costs and fines previously imposed, before the Secretary of State suspends her license for nonpayment; and
- Whether depriving persons encumbered with court debt of the protections afforded other Michigan debtors when taking the harsh action of suspending their driver's licenses for nonpayment violates the Equal Protection Clause.

## C.     Typicality — Fed. R. Civ. P. 23(a)(3)

175.   The named Plaintiffs' claims are typical of the other Class Members' claims, and they have the same interests in this case as all other Class Members.  Each Class Member has had or will have his or her driver's license suspended due to an inability to pay court debts.  The answer

to whether Defendant's wealth-based suspension scheme is unconstitutional will determine the claims of the named Plaintiffs and every other Class Member.

176.    If the named Plaintiffs succeed in the claim that Defendant's policies and practices concerning wealth-based suspension violate their constitutional rights, that ruling will likewise benefit every other Class Member.

**D.    Adequacy — Fed. R. Civ. P. 23(a)(4)**

177.    The named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same basic constitutional claims.   They are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class Members.

178.    There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional rights in the face of Defendant's wealth-based suspension scheme.

179.    Plaintiffs are represented by attorneys from Equal Justice Under Law and the Maurice & Jane Sugar Law Center for Economic & Social Justice, who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendant's scheme and the relevant constitutional and statutory law.

180.    The combined efforts of Class counsel have so far included extensive investigation into Defendant's suspension scheme, including numerous interviews with witnesses, attorneys, and advocates throughout the region, statewide experts in the functioning of state and local courts, and national experts in constitutional law, law enforcement, judicial procedures, and criminal law.

181.    Class counsel have a detailed understanding of local law and practices as they relate

to federal constitutional requirements.

182.    As a result, counsel have devoted enormous time and resources to becoming intimately familiar with Defendant's scheme and with the relevant state and federal laws.  The interests of the Class Members will be fairly and adequately protected by the named Plaintiffs and their attorneys.

**E.      Rule 23(b)(2)**

183.    Class action status is appropriate because Defendant has acted or will act in the same unconstitutional manner with respect to all Class Members.  Defendant enforces a wealth-based suspension scheme: wealthy Michigan residents who are ordered to pay costs, fees, fines, and assessments by the courts are able to retain their driving privileges, while the poorest residents are further forced into a cycle of poverty.

184.    The Class therefore seeks declaratory and injunctive relief to enjoin Secretary of State Ruth Johnson from enforcing the automatic suspensions, reinstatement fees, and Driver Responsibility Fees.    Because the putative Class challenges Defendant's scheme as unconstitutional through declaratory and injunctive relief that would apply the same relief to every Class Member, Rule 23(b)(2) certification is appropriate and necessary.

185.    Injunctive relief compelling Defendant to comply with these constitutional rights will similarly protect each Class Member from being subjected to Defendant's unlawful policies and practices.  A declaration and injunction stating that Secretary Johnson cannot suspend driver's license as a punishment for being poor would provide relief to every Class Member.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

## Claims for Relief

**Count One: Defendant's Wealth-Based Suspension Scheme Violates Due Process Because It Lacks Fundamental Fairness**

186.     Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

187.     The Fourteenth Amendment's Due Process Clause requires that Michigan maintain a standard of fundamental fairness in its justice system.   Defendant's automatic suspensions for failure to pay court debts punishes people simply for being too poor to pay, which violates the principle of Due Process because it is fundamentally unfair.

**Count Two: Defendant's Wealth-Based Suspension Scheme Violates Due Process Because It Infringes on Plaintiffs' Fundamental Right to Intrastate Travel**

188.     Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

189.     The Sixth Circuit recognizes a fundamental right to intrastate travel under the Due Process Clause.   Because Plaintiffs have no viable alternative to driving, Defendant's suspension of their licenses implicates their right to intrastate travel, and these suspensions are not narrowly tailored to meet the state objective of debt collection.

**Count Three: Defendant's Wealth-Based Suspension Scheme Violates Equal Protection Because It Discriminates Against Poor People Without a Rational Connection to a Legitimate State Purpose**

190.     Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

191.     Plaintiffs have protected property and liberty interests in their driver's licenses and their ability to drive legally.   Defendant's counterproductive collection method of suspending people's licenses when they are unable to pay court debts is not rationally related to a legitimate state interest and is therefore unconstitutional.

**Count Four: Defendant's Wealth-Based Suspension Scheme Violates Equal Protection Because It Constitutes Extraordinary Collection**

192.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

193.    Plaintiffs' equal protection rights are implicated when the State of Michigan uses its unique position as a government to execute forms of debt collection that are not available to private creditors.  By stripping Plaintiffs of their driver's licenses as a means of collection, Defendant is violating their constitutional rights under equal protection.

**Count Five: Defendant's Wealth-Based Suspension Scheme Violates Procedural Due Process Because It Does Not Guarantee an Ability-to-Pay Hearing**

194.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

195.    Plaintiffs have protected property and liberty interests in their driver's licenses and their ability to drive legally.  Defendant violates their procedural due process rights by suspending their licenses without affording them an opportunity to be heard.

### Requested Relief

WHEREFORE, Plaintiffs request that the Court issue the following relief:

a.    A declaratory judgment that Defendant's policies, practices, acts, and/or omissions as described herein are unlawful and violate Plaintiffs' and Class Members' rights under the Constitution and laws of the United States;

b.    An order and judgment preliminarily and permanently enjoining Defendant, her subordinates, agents, employees, representatives, and all others acting or purporting to act in concert with her or on her behalf from issuing or processing orders of driver's license suspensions for unpaid court debt against Plaintiffs and Class Members until such time as the State of Michigan implements a system that complies with the United States Constitution;

c.    An order and judgment preliminarily and permanently ordering Defendant to reinstate the Plaintiffs' and Class Members' driver's licenses (insofar as they are suspended based on unpaid court debt and/or on driving on licenses suspended due to unpaid court debt) and enjoining the Defendant from requiring the Plaintiffs and Class Members to pay the reinstatement fees or Driver's Responsibility Fees as a

condition of such reinstatement;

d.    An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems proper.

Respectfully submitted,

*/s/ Phil Telfeyan*

Phil Telfeyan
Catherine Sevcenko
Rebecca Ramaswamy
Attorneys, Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
catherine@equaljusticeunderlaw.org
rramaswamy@equaljusticeunderlaw.org

*/s/ John C. Philo*

John C. Philo (MI Bar Number P52721)
Maurice & Jane Sugar Law Center for Economic & Social Justice
4605 Cass Avenue
Detroit, MI 48201
(313) 993-4505
jphilo@sugarlaw.org

*Attorneys for Plaintiffs*

32