UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADRIAN FOWLER and
KITIA HARRIS, on behalf of themselves
and others similarly situated,

        Plaintiffs,                Civil Case No. 17-11441
                                          Honorable Linda V. Parker

v.

RUTH JOHNSON, in her official
capacity as Secretary of State of the
Michigan Department of State,

        Defendant.

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On May 4, 2017, Plaintiffs filed this putative class action lawsuit

challenging Defendant's practice, pursuant to Michigan Compiled Laws

§ 257.321a, of suspending the driver's licenses of individuals who fail to pay

court-ordered fines, costs, fees and assessments resulting from traffic violations

("traffic debt"). On the day Plaintiffs initiated this action, they also filed a motion

for preliminary injunction to enjoin Defendant from suspending the driver's

licenses of people unable to pay their traffic debt. (ECF No. 2.) The parties have

fully briefed the motion. (ECF No. 11, 13.) The Court held a hearing with respect

to Plaintiffs' motion on November 15, 2017.  For the reasons that follow, the Court is now granting the motion.

## I.    Background

Under Michigan's Motor Vehicle Code, the failure to follow certain traffic laws results in a civil infraction that includes a fine.  For each civil infraction, a judge can order costs of up to $100 and, in the majority of cases, must also impose a mandatory justice system assessment of $40.  Mich. Comp. Laws § 257.907(4), (13).  Any fine, cost, or fee remaining unpaid after fifty-six (56) days incurs a twenty-percent (20%) late fee.  *Id*. § 600.4803.

Michigan law provides that twenty-eight (28) days after a person fails to answer a traffic citation or notice to appear in court for a citation, the court must notify the person that the failure within fourteen (14) days to appear in court or comply with an order or judgment of the court (including the failure to pay all fines, costs, fees, and assessments) will result in the Secretary of State suspending his or her driver's license.  Mich. Comp. Laws § 257.321a(2).  The statute requires the Secretary of State to "immediately suspend" a person's license if the person does not appear or payment is not made within fourteen (14) days and to notify the person of the suspension by regular mail at his or her last known address.  *Id*. Additionally, an individual who fails to pay their traffic debt is guilty of a

misdemeanor, punishable by imprisonment for not more than ninety-three (93) days or a fine of not more than $100, or both. *Id*. § 257.321a(1).

An individual seeking to get his or her license reinstated must pay each underlying debt, as well as a $45 driver's license clearance fee for each unpaid ticket or cost. Mich. Comp. Laws § 257.321a(5). If a person is caught driving on a suspended license ("DWLS"), he or she faces a second misdemeanor punishable by up to ninety-three (93) days' imprisonment or a fine of up to $500, or both. *Id.* § 257.904. Subsequent DWLS violations may lead to up to one years' imprisonment or a fine of up to $1,000, or both. *Id*. An individual receiving an additional suspension due to a DWLS must pay a reinstatement fee of $125 to the Secretary of State before his or her license can be reinstated. *Id*. § 257.320e(1). That individual also must pay a Driver Responsibility Fee of up to $1,000 over two years. *Id*. § 257.732a(2)(b)(iii).[1]

Within fourteen (14) days of the suspension or revocation of an individual's license, the individual may file an appeal with the Secretary of State.[2] *Id*.

---

[1] Michigan is phasing out these Driver Responsibility Fees by statute; however, current law provides that the State will continue to impose the fees for all offenses occurring before October 1, 2019. *See* Mich. Comp. Laws § 257.732a(11). The Michigan legislature is considering laws to speed up the elimination of these fees. *See* SB 609-615 and HB 5040-5046, 2017 Leg. (Mich. 2017). At the motion hearing, the parties agreed that the proposed legislation would not moot Plaintiffs' claims.

[2] The record does not reflect how the State notifies an individual of his or her right to seek an administrative appeal or review in the circuit court discussed *infra*.

§ 257.322(2). The appeal must be in writing. *Id*. The Secretary of State then is required to appoint a hearing officer to hear the appeal. *Id*. § 257.322(1). After the administrative appeal is concluded, the individual may petition for review in a Michigan circuit court. *Id*. § 257.323. The petition must be filed within sixty-three (63) days from the hearing officer's determination, or within one hundred and eighty two (182) days if good cause is shown. The circuit court may set aside the Secretary of State's determination if it finds *inter alia* that the individual's "substantial rights have been prejudiced because the determination is … [i]n violation of the Constitution of the United States …" *Id*. § 257.323(4)(a)(i).

Plaintiffs Adrian Fowler and Kitia Harris are Michigan residents who claim to have had their driver's licenses suspended pursuant to the aforementioned statutory provisions. While living in Georgia from 2008 to 2012, Ms. Fowler was issued three tickets for civil traffic infractions, which she was not able to pay. (Fowler Decl. ¶ 4, ECF No. 2-1.) When she moved back to Michigan in 2012, Ms. Fowler tried to renew her Michigan driver's license and was informed that it was suspended because she had not paid her Georgia court debts. (*Id*. ¶ 5.) According to Defendant, Ms. Fowler was not able to renew her license because Michigan law precludes the Secretary of State from issuing a license to someone whose license is

revoked or suspended in another state.[3]  (Def.'s Resp. Br. at 3, ECF No. 11 at Pg

ID 117.)  Defendant indicates that Georgia suspended Ms. Fowler's license for

nonpayment of court debts.[4]  (*Id.*)

Ms. Fowler is the sole caretaker of her three-year-old daughter.  (Fowler

Decl. ¶ 2.)  They reside in Detroit.  (*Id.* ¶ 1.) In winter 2013, during an ice storm,

Ms. Fowler's daughter developed a high fever.  (*Id.* ¶ 6.)  Fearing that the ice

would inhibit an ambulance from quickly arriving to transport her daughter to the

hospital, Ms. Fowler decided to drive her there.  (*Id.*)  A police officer stopped Ms.

Fowler for speeding in Ferndale, and issued her a speeding ticket and DWLS

citation.  (*Id.*)  The total cost was almost $600.  (*Id.*)

Ms. Fowler claims that when she went to the Ferndale courthouse to report

that she was unable to pay the $600, she was told that a warrant would be issued

for her arrest if she did not return in three weeks with the full amount.  (*Id.* ¶ 7.)

As of May 3, 2017, Ms. Fowler also had unpaid fines in Eastpointe for $752 and

---

[3] Michigan Compiled Laws Section 257.303(1) provides, in relevant part: "The secretary of state shall not issue a license under this act to any of the following persons: … (c) A person whose license is suspended, revoked, denied, or canceled in any state."  Because Defendant did not renew Ms. Fowler's Michigan license when she returned from Georgia because of the suspension of her driver's license there, Defendant has not suspended Ms. Fowler's license according to the scheme Plaintiffs now challenge.  For that reason, she most likely lacks standing to pursue this lawsuit.

[4] Defendant attaches a certified copy of Ms. Fowler's driving record to its response brief, which it claims reflects her suspension in Georgia for failing to appear in court on two counts.  (*See* Def.'s Resp., Ex. 1.)

Oak Park for $703. (*Id.* ¶ 9.) She indicates that those fees are the result of warrants issued when she missed court dates. (*Id.* ¶ 8.) Ms. Fowler's driving record reflects a citation issued in Eastpointe for driving while her license was suspended and multiple traffic violations in Oak Park (prohibited turn, disobeying a stop sign, and failing to display a valid license). (Def.'s Resp., Ex. 1.)

Ms. Fowler claims that she is unable to pay these fines, but that the lack of a driver's license severely hampers her ability to find better employment and any chance that she will be able to pay them in the future. (Fowler Decl. ¶¶ 11, 12.) Ms. Fowler currently works part-time for a security company, earning $8.90 per hour or about $712 per month. (*Id.* ¶ 3.) Each month, she pays $850 in rent and an additional $500 to $600 for utilities, groceries, and other everyday needs for herself and her daughter. (*Id.* ¶ 11.) Ms. Fowler was offered a $12.50 per hour job with Blue Chip Endeavors. (*Id.* ¶ 15.) She had to turn it down, however, because it required her to travel throughout the metropolitan area, which she cannot do without a valid license and viable public transportation options between the city and suburbs.[5]

Ms. Harris is a single mother with an eight-year-old daughter. (Harris Decl. ¶ 2.) They reside in Detroit. (*Id.* 1.) In November 2014, Ms. Harris was diagnosed

_____

[5] Plaintiffs contend that Detroit's public transportation system is "notoriously inadequate" and they provide evidence reflecting that the city's bus system is unreliable and often requires long commutes. (Pls.' Br. in Supp. of Mot. at 9-10, ECF No. 2 at Pg ID 58-59; Exs. 4, 5.)

with interstitial cystitis, a chronic condition that prevents her from working.  (*Id*.

¶ 4.)  Ms. Harris previously worked at Blue Cross Blue Shield in Rochester,

Michigan.  (*Id*. ¶ 5.)  She was fired in December 2015, however, because her

medical condition interfered with her job performance.  (*Id*.)  She has not held a

job since then.  (*Id*.)

In October 2016, a police officer in Ferndale stopped Ms. Harris and issued

her a ticket for "impeding traffic."  (*Id*. ¶ 7.)  The fine was $150, which Ms. Harris

claims she is not able to pay.  (*Id*.)  About a month later, after receiving notices

that her payment was due, Ms. Harris received a notice stating that her driver's

license had been suspended.  (*Id*. ¶ 8.)  Ms. Harris must pay a total of $276 to have

her license reinstated.  (*Id*. ¶ 9.)

Each month, Ms. Harris pays $600 in rent, $350 for food, and $400 for her

utilities and other living expenses.  (*Id*. ¶ 10.)  She also has to pay her landlord

$100 each month to build up a security deposit.  (*Id*.)  Any additional income Ms.

Harris has goes to reducing her medical debt and buying clothing and school

supplies for her daughter.  (*Id*.)   Ms. Harris receives $938 per month in disability

benefits, plus an additional $280 in benefits for her daughter, and $300 in food

stamps.  (*Id*. ¶ 6.)

Ms. Harris' medical condition requires her to have regular medical

appointments, usually bi-weekly.  (*Id*. ¶ 11.)  Her doctor's office is a thirty-minute

drive from her home. (*Id*.) Ms. Harris cannot ride the bus, because her medical condition makes it unsafe for her to stand for more than a few minutes. (*Id*. ¶ 12.) Lacking a driver's license, Ms. Harris must pay people to drive her where she needs to go. (*Id*.) Because she relies on other people for rides, Ms. Harris is frequently late for her medical appointments and often has to cancel or reschedule her appointments at the last minute, which negatively impacts her health. (*Id*. ¶ 13.)

## II.    Defendant's Jurisdictional Arguments

In response to Plaintiffs' motion, Defendant first argues that this Court lacks or should decline to exercise jurisdiction over this matter. The Court must address these arguments first.

### A.    The *Rooker-Feldman* Doctrine

Defendant contends that this Court lacks subject matter jurisdiction to adjudicate Plaintiffs' claims under the *Rooker-Feldman* doctrine because "they are at bottom launching a collateral attack against valid state court orders." (Def.'s Resp. Br. at 8-9, ECF No. 11 at Pg ID 122-23.) Contrary to Defendant's assertion, Plaintiffs are not collaterally attacking any state court order.

As Plaintiffs' counsel made clear at the motion hearing, Plaintiffs are not contesting their liability for violating the traffic laws for which they received citations. Nor are they challenging the imposition of any fines, costs, or

assessments resulting from those violations.  Instead, Plaintiffs are challenging

Defendant's revocation of their driver's licenses for failing to pay their traffic debt

without consideration of their willfulness or ability to pay.  The *Rooker-Feldman*

doctrine does not extend to Plaintiffs' claims.

The Supreme Court made this clear in *Exxon Mobil Corporation v. Saudi*

*Basic Industries Corporation*, 544 U.S. 280 (2006), when it stated:

> Variously interpreted in the lower courts, the doctrine has
> sometimes been construed to extend far beyond the
> contours of the *Rooker* and *Feldman* cases, overriding
> Congress' conferral of federal-court jurisdiction
> concurrent with jurisdiction exercised by state courts, and
> superseding the ordinary application of preclusion law
> pursuant to 28 U.S.C. § 1738.

*Id*. at 283. Since *Exxon Mobil*, the Sixth Circuit "has tightened the scope of

*Rooker-Feldman*[,]" explaining that it "is a doctrine with only limited application."

*Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 606 F.3d 301, 309

(6th Cir. 2010) (quoting *Coles v. Granville*, 448 F.3d 853, 857 (6th Cir. 2006)).

Specifically, as the *Exxon Mobil* Court explained,

> The *Rooker-Feldman* doctrine we hold today, is confined
> to cases of the kind from which the doctrine acquired its
> name: cases brought by state-court losers complaining of
> injuries caused by state-court judgments rendered before
> the district court proceedings commences and inviting
> district court review and rejection of those judgments.

544 U.S. at 284.  The Sixth Circuit has "explained that the pertinent inquiry after

*Exxon* is whether the 'source of the injury' upon which [the] plaintiff bases his

federal claim is the state court judgment, not simply whether the injury complained of is 'inextricably intertwined' with the state-court judgment[.]" *Kovacic*, 606 F.3d at 309. A state court judgment is not the source of Plaintiffs' injuries. The *Rooker-Feldman* doctrine therefore does not deprive this Court of subject matter jurisdiction.

### B. *Pullman* & *Younger* Abstention

Defendants alternatively argue that the Court should abstain from exercising its subject matter jurisdiction under the doctrines set forth in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), and *Younger v. Harris*, 401 U.S. 37 (1971).

In *Pullman*, the Supreme Court "held that federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). "[T]he primary scenario for a district court's application of *Pullman* abstention is one in which the state-law question is an unsettled issue best decided by state courts." *Jones v. Coleman*, 848 F.3d 744, 750 (6th Cir. 2017) (citing *Harris Cty. Comm'rs Court v. Moore*, 467 U.S. 229, 236 (1984)). More recently, the Supreme Court has recommended the certification of a novel question of state law to the state courts as more preferable to abstaining under *Pullman*. *Id.* (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43,

10

75-76 (1997)). "'In cases involving a facial challenge to a statute,' the threshold question is 'whether the statute is fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'" *Id*. at 750-51 (quoting *City of Houston, Tex. v. Hill*, 482 U.S. 451, 468 (1987)) (additional quotation marks and citation omitted).

Defendant has not identified anything ambiguous about the relevant Michigan Motor Vehicle Code provisions to necessitate *Pullman* abstention. Instead, Defendant argues that *Pullman* abstention is appropriate because "Michigan law expressly provides that federal constitutional rights are to be protected when driver's licenses are suspended." (Def.'s Resp. Br. at 11, ECF No. 11 at Pg ID 125.) In other words, Defendant maintains that "because Michigan law is already written in a way that recognizes constitutional limitations[,]" this Court should abstain. Abstain to allow the state courts to do what, however? According to Defendant, the only possible interpretation of Michigan's license revocation scheme is that it protects drivers' constitutional rights. Thus, *Pullman* abstention is inapplicable.

The Supreme Court's decision in *Younger* "bars a federal district court from intervening in a state civil proceeding … when the proceeding is based on a state statute believed by the district court to be unconstitutional." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 594 (1975). The Supreme Court and Sixth Circuit "have

mandated three requirements for a district court to properly invoke *Younger* abstention." *Squire v. Coughlan*, 469 F.3d 551, 555 (6th Cir. 2006) (citation omitted); *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). Those factors are: "'(1) there must be on-going state judicial proceedings; (2) those proceedings must implicate important state interests; and (3) there must be an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Squire*, 469 F.3d at 555 (quoting *Sun Ref. & Mktg. Co. v. Brennan*, 921 F.2d 635, 639 (6th Cir. 1990)); *Middlesex Cty. Ethics Comm.*, 457 U.S. at 432. Here, there are no ongoing or threatened state court proceedings. Plaintiffs are not seeking to use this federal litigation to enjoin continuation of any state court proceeding. There is no basis for *Younger* abstention.

**C.    The Court's Discretion to Exercise Jurisdiction over Plaintiffs' Request for Declaratory Relief**

Defendant urges the Court to exercise its discretion and refuse to consider Plaintiffs' request for declaratory relief.

"[T]he granting of a declaratory judgment rests in the 'sound discretion' of the court[.]" *Grand Trunk Western R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). In *Grand Trunk*, the Sixth Circuit identified two principal criteria to guide a court's determination of whether declaratory relief is appropriate: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief

from uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* at 326. "[W]hen neither of these results can be accomplished, the court should decline to render the declaration prayed." *Id.*

The Sixth Circuit has set forth five factors for courts to consider in deciding whether declaratory relief will accomplish those criteria:

> (1) whether the declaratory action would settle the controversy;
>
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue;
>
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or to provide an arena for a race for res judicata;
>
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
>
> (5) whether there is an alternative remedy which is better or more effective.

*Id.* at 326.

Defendant argues that the first factor weighs against declaratory relief because drivers like Ms. Fowler whose driver's licenses are suspended in other states are ineligible for a driver's license under Michigan law. (Def.'s Resp. Br. at 13-14, Pg ID 126-27.) Defendant also argues that granting declaratory relief in this case will cause "[u]nnecessary federal intervention into Michigan's licensing regulation and state court judgment enforcement[,]" "create unjustifiable friction

between federal and [s]tate courts," and "improperly interfere with the State's ability to enforce the Motor Vehicle Code, the Revised Judicature Act, local ordinances, and all other manner of law that touches on driver responsibility." (*Id.* at 13, Pg ID 127.) Finally, Defendants contend that there is no useful purpose served by granting declaratory relief "because Plaintiffs and all motorists should already know they are required to follow traffic laws, come to court when ticketed, plead their case and their circumstances (including ability to pay), and then follow whatever valid order the court enters." (*Id.*) This Court disagrees with Defendant and finds that the relevant factors militate in favor of deciding whether Plaintiffs are entitled to declaratory relief.

A declaratory judgment will settle the controversy between the parties and clarify the constitutionality of Michigan's scheme for suspending driver's licenses. Ms. Fowler may not adequately represent the putative class because she is ineligible for a driver's license due to Georgia's suspension of her license. In other words, she did not have a Michigan license suspended according to the scheme now challenged. Nevertheless, Ms. Harris appears to be a proper plaintiff to present the question of whether it is constitutional for Michigan to suspend a driver's license for failure to pay court debts the licensee cannot afford. The Court's resolution of this matter will cause no more friction than is necessarily created whenever a federal court hears a constitutional challenge to a state law.

Undoubtedly, if the Court finds Defendant's suspension scheme unconstitutional, it will interfere with the State's ability to continue that scheme. However, that interference is not "improper," but rather mandated, as the federal courts have an obligation to protect individuals from the enforcement of unconstitutional state action. For the same reason, the Court must reject Defendant's assertion that "there is no useful purpose served here."

Thus, a balancing of the relevant factors supports the Court's exercise of jurisdiction over Plaintiffs' request for declaratory relief. Having rejected Defendant's abstention arguments, the Court turns to the merits of Plaintiffs' constitutional claims.

## III.    Preliminary Injunction Standard

A district court must balance four criteria in deciding whether to issue a preliminary injunction:

> "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction."

*Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013) (quoting *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)) (brackets omitted). "'When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits will often be the

determinative factor.'" *Id*. (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

## IV.    Plaintiffs' Likelihood of Success on the Merits

Plaintiffs allege in their Complaint, "Defendant's indefinite suspensions of [their] driver's licenses because of their inability to pay court debts violated their constitutional rights under the Equal Protection and Due Process Clauses." (Compl. ¶ 117, ECF No. 1 at Pg ID 19.)  Plaintiffs put forth several theories to explain how Defendant's suspension scheme is unconstitutional.

### A.    The Due Process Clause & Fundamental Fairness

Plaintiffs assert that Michigan's suspension scheme violates the Due Process Clause because it lacks fundamental fairness.  More specifically, Plaintiffs contend that Michigan's practice of suspending a driver's license because of the failure to pay a court debt the licensee cannot afford is fundamentally unfair.

The Supreme Court has identified fundamental fairness as "the touchstone of due process." *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1972).  In a series of cases, the Court has struck down state practices—mainly in the context of criminal proceedings— because it has found those practices fundamentally unfair.  For example, in *Griffin v. Illinois*, the Supreme Court struck down the State's practice of granting appellate review of criminal convictions only to defendants able to afford a trial transcript.  351 U.S. 12 (1956).  As the Court reasoned, "there can be

16

no equal justice where the kind of trial a man gets depends on the amount of money he has." *Id*. at 19. Plaintiffs cite the following additional cases where the Court found a state law violative of fundamental fairness: *Bearden v. Georgia*, 461 U.S. 660 (1983) (holding that it is fundamentally unfair to revoke probation because a probationer is unable to pay fines and restitution); *Tate v. Short*, 401 U.S. 395 (1971) (holding that it is fundamentally unfair to jail a person for inability to pay a fine); *Williams v. Illinois*, 399 U.S. 235 (1970) (holding that it is fundamentally unfair to imprison a person beyond the maximum period fixed by statute solely because he cannot pay fines or court costs); *see also Powers v. Hamilton Cty. Public Defender Comm'n*, 501 F.3d 592 (6th Cir. 2007) (holding that the automatic incarceration of an arrestee for failure to pay a fine, without conducting an indigency hearing to determine his ability to pay the fine, was fundamentally unfair).

These cases establish that there can be no debtor's prison and that the States may not deny criminal defendants certain rights or their liberty based on their ability to pay. None of these cases establish, however, that it is fundamentally unfair in a *constitutional* sense (i.e., in violation of the Due Process Clause) for a state to deprive a person of a property interest—such as a driver's license—because of the person's inability to pay a fine associated with that interest. Existing case law offers no support that the Due Process Clause extends this far.

However, this Court sees an analogous situation in Michigan where the State or a county legally forecloses on a residence due to the homeowner's failure to pay property taxes where the homeowner lacks the funds to do so. The property interest deprived in that setting—which may lead the individual and his or her family to become homeless—is no doubt as significant as a person's interest in his or her driver's license. *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) (describing the "right to maintain control over [one's] home" as "a private interest of historic and continuing importance"). However, such an action is not barred by the Due Process Clause

It appears to be unfair to deprive individuals of their driver's licenses due to their failure to pay traffic fines they are unable to pay. Doing so also appears to be an unwise response because, without a license, individuals in Michigan likely will find it more difficult to find and retain employment and therefore repay their debts. Nevertheless, pursuant to Supreme Court precedent, this does not render a state practice unfair in a *constitutional* sense. As the Supreme Court provided in the context of an Equal Protection Clause challenge to state law:

> Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably

18

> conceivable state of facts that could provide a rational
> basis for the classification.

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

Absent a fundamental right or suspect classification, due process requires only that the government act rationally and afford certain procedural protections before the deprivation of protected interests. *See id.*; *Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that driver's licenses "are not to be taken away without that procedural due process required by the Fourteenth Amendment"). Later in this decision, the Court will address whether Michigan's challenged practice is rational and comports with procedural due process. Plaintiffs' challenge to Michigan's suspension scheme based on their claim that it is fundamentally unfair, however, is not likely to succeed.

## B.     Substantive Due Process & the Right to Intrastate Travel

According to Plaintiffs, "Michigan's policy of depriving Plaintiffs of their driver's licenses because they are too poor to pay their traffic fines strips them of their mobility, implicating their constitutional right to travel[.]" (Pls.' Br. in Supp. of Mot. at 15, ECF No. 2 at Pg ID 64.)

In *Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016), the Sixth Circuit held that intermediate scrutiny is appropriate when evaluating the city's routine practice of sweeping "a mere two-block stretch for limited periods of time between 3 and 5 a.m., typically on weekend mornings and sometimes after special events."

*Id.* at 537-38.  The *Cole* court acknowledged the right to intrastate travel, but

reasoned that this right "'cannot conceivably imply the right to travel whenever,

wherever and however one pleases …'"  *Id.* at 536 (quoting *Lutz v. City of New*

*York*, 299 F.2d 255, 269 (3d Cir. 1990)).  In fact, the Sixth Circuit, as well as many

other Circuit Courts, have held that denying an individual a single mode of

transportation—such as a car driven by the individual him or herself—does not

unconstitutionally impede the individual's right to intrastate travel because there is

no fundamental right to drive.  *See, e.g., Duncan v. Cone*, No. 00-5705, 2000 WL

1828089, at *2 (6th Cir. Dec. 7, 2000) (unpublished) (relying on *Miller v. Reed*,

176 F.3d 1202 (9th Cir. 1999), to hold that "there is no fundamental right to drive a

motor vehicle"); *Matthew v. Honish*, 233 F. App'x 563, 564 (7th Cir. 2007)

(holding that the denial of a driver's license only denies the plaintiff the ability to

drive himself in a car, and thus "does not impermissibly burden his right to

travel"); *Abuhouran v. Soc. Sec. Admin.*, 291 F. App'x 469, 473 (3d Cir. 2008)

(same); *see also Dixon v. Love*, 431 U.S. 105, 112-16 (1977) (conspicuously not

affording the possession of a driver's license the weight of a fundamental right in

holding that a state can summarily suspend or revoke the license of a motorist

repeatedly convicted of traffic offenses with due process satisfied by a full

administrative hearing available only after the suspension or revocation had taken

place).  As the Sixth Circuit stated in *Duncan*, "[a] burden on a single mode of

transportation simply does not implicate the right to … travel." 2000 WL 1828089, at *2.

Plaintiffs urge this Court to recognize a fundamental right to drive under the circumstances presented here—i.e., where, they assert, public transportation is woefully inadequate and thus, they argue, Plaintiffs lack access to other modes of travel. Fundamental rights are not identified by looking so narrowly or locally, however. Instead, the Due Process Clause provides heightened protection against government interference for only those liberty interests that are "traditionally protected by our society" and those " 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Michael H. v. Gerald D.*, 491 U.S. 110, 122-23 (1989) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)). As the Supreme Court has otherwise stated, fundamental liberties are those that are "deeply rooted in this *Nation's* history and tradition." *Moore v. East Cleveland*, 431 U.S. 494, 504 (1977) (emphasis added). Thus in spite of the challenges placed on Michigan drivers due to its transportation system, particularly in certain geographical areas, such challenges would not be deemed fundamental in a national or constitutional sense.

In short, there is a fundamental right to intrastate travel, as Plaintiffs assert. Nevertheless, this right is not infringed by Defendant's suspension scheme that deprived Plaintiffs of their driver's licenses and thus the ability to travel by a car

they drive.  In other words, Plaintiffs are not likely to establish a violation of their substantive due process right to intrastate travel.

### C.    Rational Basis Review

Michigan's scheme for suspending driver's licenses neither interferes with a fundamental right nor discriminates against individuals based on a suspect class.[6] Plaintiffs nevertheless argue that it fails rational basis review.

When a challenged law neither creates classifications nor burdens a fundamental right, however, "[e]ven the deferential 'rational basis' scrutiny that is applied to ordinary governmental classifications is not appropriate."[7] *Johnson v.*

---

[6] Plaintiffs contend that the scheme discriminates based on wealth, but as their counsel acknowledged at the motion hearing, wealth-based classifications do not discriminate against a suspect class. *See Papasan v. Allain*, 478 U.S. 265, 283-84 (1977)).

[7] The need for a classification in the challenged law seems to be a threshold element to prove an equal protection analysis, as the Equal Protection Clause, at its essence, requires that "all persons similarly situated … be treated alike." *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  Nevertheless, in its research, the Court did not locate Sixth Circuit precedent clearly stating this requirement or that rational basis review is inapplicable absent a classification.  Further, most decisions—in the Sixth Circuit and elsewhere—seem to bypass this step and proceed directly to a discussion of the type of classification at issue and, thus the applicable level of scrutiny.  This may be because most cases involve statutes providing some type of facial classification or distinction in treatment.  *See Romer v. Evans*, 517 U.S. 620, 631 (1996) (Recognizing that "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons").  The dearth of caselaw gives this Court some pause as to whether the Sixth Circuit still would require a law lacking a classification to have some rationality.  The Court finds it unnecessary to analyze the issue further at this time, however, because it concludes for other reasons that injunctive relief is appropriate.

*Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997); *see also McCoy v. Richards*, 771 F.2d 1108, 1112 (7th Cir. 1985); *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995) ("[O]nly if the use of a classification is thus established does the equal protection analysis proceed with the inquiry into whether the classification furthers a legitimate legislative purpose."); "'[I]f the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action—even if irrational—does not deny them equal protection of the laws.'" *Rodriguez*, 110 F.3d at 306 (quoting *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988)). On its face, Michigan Compiled Laws § 257.321a does not classify or distinguish between two or more persons or groups. All drivers who fail to pay their traffic debt will have their license revoked pursuant to the statute. That the law may have a disparate impact on indigent drivers does not change this result absent evidence of discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 248 (1976); *see also Lewis v. Casey*, 518 U.S. 343, 375 (1996) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 273 (1979) ("At bottom, *Davis* was a recognition of 'the settled rule that the Fourteenth Amendment guarantees equal laws, not equal results.'").

Plaintiffs present no evidence suggesting that the Michigan legislature selected the current driver's license revocation scheme "'at least in part because of, and not merely in spite of, its adverse effects upon an identifiable group.'"

*McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (quoting *Feeney*, 442 U.S. at 279)

(internal quotation marks and citation omitted).

In short, the lack of a rational basis to support the challenged law does not

establish Plaintiffs' likelihood of success in this matter.

## D. Extraordinary Collection

Plaintiffs maintain that Michigan's scheme for suspending driver's licenses

is an "extraordinary collection effort" that violates the Equal Protection Clause.

Relying on the Supreme Court's decision in *Strange*, 407 U.S. 128, Plaintiffs argue

that the scheme violates the Equal Protection Clause's guarantee that an individual

will not "be treated differently as debtors to the state than they would be treated as

civil debtors," and that individuals are able "to afford basic necessities and [to]

make a living." (Pls.' Br. in Supp. of Mot. at 20, ECF No. 2 at Pg ID 69.) Nothing

in *Strange* suggests that the Court's holding would apply here and Plaintiffs cite no

case reading the Equal Protection Clause's guarantees in a way that Plaintiffs

assert *Strange* does.

In *Strange*, the Supreme Court held that a Kansas statute violated the Equal

Protection Clause because it permitted the State to recoup court-appointed attorney

fees from indigent criminal defendants without permitting them to raise any of the

defenses available to other civil judgment debtors, including certain protections

from wage garnishment. 407 U.S. at 142. The Court stated that the Equal

24

Protection Clause "imposes a requirement of some rationality in the nature of the class singled out" and that such rationality "is lacking where, as in the instant case, the State has subjected indigent defendants to such discriminatory conditions of repayment" not imposed on other judgment debtors. *Id*. at 140.

The Supreme Court later clarified that the issue with the statute in *Strange* was "its provision that in an action to compel repayment of counsel fees '(n)one of the exemptions provided for in the code of civil procedure (for collection of other judgment debts) shall apply to any such judgment …' " *Fuller v. Oregon*, 417 U.S. 40, 47 (1974) (quoting *Strange*, 407 U.S. at 135). The *Fuller* Court was addressing an equal protection challenge to an Oregon recoupment statute similar to the Kansas statute in *Strange*, except that the Oregon statute lacked the Kansas statute's provision stripping protective exemptions available to most judgment debtors. *Fuller*, 417 U.S. at 43, 47. As the Court found in *Strange*, the Kansas legislature's elimination of those exemptions "embodies elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law." *Strange*, 407 U.S. at 142. The *Fuller* Court rejected the petitioner's equal protection claim because it found that Oregon's recoupment statute "suffers from no such infirmity." 414 U.S. at 47.

*Strange* holds that the Fourteenth Amendment precludes the government from subjecting government debtors to unduly harsh treatment when compared to

those individuals indebted to private creditors.  The Michigan statutes at issue here, like Oregon's recoupment statute challenged in *Fuller*, do not expressly eliminate any exemptions normally available to judgment creditors with respect to the collection of a government debt.

As such, Plaintiffs fail to demonstrate a likelihood of success on their claim that Michigan's scheme for suspending driver's licenses is an extraordinary collection effort that violates the Equal Protection Clause.

### E.    Procedural Due Process

Lastly, Plaintiffs assert that Defendant violated their procedural due process rights by suspending their driver's licenses without first affording them an "ability-to-pay hearing[.]"  Plaintiffs challenge the content of the hearing afforded (i.e., whether it considers their ability to pay) and the timing of the hearing (i.e., whether it occurs before their license is suspended).

The United States Supreme Court has recognized "that suspension of a driver's license for statutorily defined cause implicates a protectable property interest" subject to due process protection.  *Mackey v. Montrym*, 443 U.S. 1, 10 (1979); *Bell v. Burson*, 402 U.S. at 539 ("licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.").  The Michigan Supreme Court likewise has recognized that an individual's interest in his or her driver's license is entitled to due process protection because

> [i]n Michigan the independent mobility provided by an automobile is a crucial, practical necessity; it is undeniable that whether or not a person can obtain a driver's license or register and operate his motor vehicle profoundly affects important aspects of his day-to-day life.

*Shavers v. Kelley*, 402 Mich. 554, 598 (Mich. 1978).

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks and citation omitted). "A procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." *Bell v. Burson*, 402 U.S. at 540. What process is due depends on several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Eldridge*, 424 U.S. at 335. "[I]t is fundamental[,]" however, "that except in emergency situations …due process requires that when a State seeks to terminate an interest such as that here involved [a driver's license], it must afford notice and opportunity for hearing appropriate to the nature of the case *before* the termination becomes effective." *Bell*, 402 U.S. at 542 (emphasis added, internal quotation

marks and citation omitted).  For the reasons that follow, the Court finds that Defendant does not afford the appropriate notice and opportunity for hearing before revoking a driver's license pursuant to Michigan Compiled Laws § 257.321a.

First, it does not appear that Michigan licensed drivers are informed of the risk of revocation until well after they fail to answer a traffic citation.  *See* Michigan Comp. Laws § 257.321a(2).  While the parties have not submitted a sample traffic citation with their filings, the Court did locate one example on the website of Michigan's 43rd District Court (where Ms. Harris received her traffic citation).  That citation does not inform individuals that their failure to pay a traffic fine or appear in court will or may result in the suspension of their driver's license. See http://www.ferndalecourt.com/uploads/6/3/1/8/63189429/ticket_info.pdf.  It appears that the first notice a licensee receives of the risk of revocation is when the court sends out the notice required under Section 257.321a(2), which happens twenty-eight days after the individual fails to answer the citation or appear in court.

Further, when individuals do receive that notice, they are given only fourteen days to respond before their license is suspended.  Moreover, the notice suggests that the only possible response that will avoid suspension is full payment of the outstanding traffic debt.  The notice does not inform indigent individuals that they may seek an alternative to paying their traffic fines in full to avoid

suspension.  And unlike many states, Michigan's statutory scheme does not include a provision informing individuals that they can, with approval of the court, pay any traffic debt by establishing a payment plan.  *See, e.g.*, Tenn. Code Ann. § 55-50-502(d)(2); Ohio Rev. Code Ann § 4510.10; Va. Code Ann. § 46.2-395(B), (C).

Finally, the Order of Suspension Defendant sends drivers once their license is suspended for failure to answer a traffic citation or comply with a court judgment does not inform them of the right to request a hearing.  (*See* ECF No. 20-1 at Pg ID 224-33.)  The order instructs the driver to send his or her license to the Michigan Department of State and to contact the district court "[t]o restore your driving privileges[.]"  (*Id.*)  Highlighted is the instruction to "**PLEASE MAKE PAYMENT TO THE COURT**" and the recipient is informed that, in addition to fines and costs, a $45.00 reinstatement must be paid.  (*Id.*)  There are no instructions on how to request a hearing or appeal the decision; instead, the order states only that "[t]he court may require you to appear …"  (*Id.*)  Michigan law provides a right to appeal the license suspension, but there is no indication of how affected individuals are informed of this right.  Moreover, the appeal must be in writing and must be received by Defendant's division office in Lansing within fourteen days from the date of Defendant's suspension determination.  Mich. Comp. Laws § 257.322(2).

Defendant argues that Plaintiffs should have appeared in court in response to their traffic citations to assert their inability to pay the imposed fine. Plaintiffs argue in response that nothing informed them that they had the right to do so. In fact, citations issued in Ferndale reflect that only drivers cited for defective equipment violations or no proof of insurance may get the fine waived at a court appearance. *See* http://www.ferndalecourt.com/uploads/6/3/1/8/63189429/ticket_info.pdf. Unless a misdemeanor violation is involved, the citation does not even appear to inform drivers of their need to appear at a hearing. *Id.* The information provided on the court's website would not alert an individual with a traffic citation who does not challenge his or her liability of any alternative but paying the citation in full.[8] *See* http://www.ferdale.court.com/trafficparking.html.

The 43rd District Court citation to the contrary reads that payment must be made within ten days and "must be PAID IN FULL at the time of assessment." *Id.* (emphasis in original). This is consistent with what Fowler says she was told when she appeared at the Ferndale courthouse in response to a citation and claimed she

---

[8] The Court reviewed the websites of the other Michigan district courts where Ms. Fowler or Ms. Harris were cited for failing to appear in response to traffic citations. *See* http://www.36thdistrictcourt.org/divisions-departments/traffic; http://45dc.org/45B-Ct-Traffic.html; and http://www.38thdistrictoucrt.us/traffic-fines.html. None of these websites inform individuals with traffic citations that they may come to court and request a reduced fine, payment plan, or alternative to paying their traffic debt in full. *Id.*

was unable to pay the fine. (Fowler Decl. ¶ 7, ECF No. 2-1.) As such, individuals lacking the means to pay their Michigan traffic debt do not receive notice and an opportunity to meaningfully challenge the threatened revocation of their licenses.

There is unquestionable value to an ability-to-pay hearing prior to the revocation of an individual's license. The State's interests in encouraging Michigan drivers to pay their traffic debt and to respond to traffic citations are actually harmed by the absence of such a hearing. Taking away an individual's license to drive—particularly in a state lacking an efficient and extensive public transportation system, such as Michigan—deprives the individual of the means to earn the money needed to pay their traffic debt. Affording individuals an opportunity at a pre-revocation hearing to request alternatives to paying their traffic debt in full would provide an incentive for them to appear in court in response to traffic citations. It likely would also increase the chance of the State recouping the debt. Finally, instituting a mechanism whereby an individual's ability to pay his or her traffic debt is considered early in the process will eliminate fiscal and administrative burdens imposed on the State under the current scheme when that individual unwillingly fails to pay that debt.

For these reasons, the Court concludes that Plaintiffs demonstrate a likelihood of success on their claim that Michigan's scheme for suspending driver's licenses violates procedural due process.

## V.  Other Factors

The remaining factors governing a request for preliminary injunction weigh in favor of granting Plaintiffs relief.  The Court agrees with Defendant that Ms. Fowler would not benefit from the requested preliminary injunction because she was not subjected to the challenged driver's license revocation scheme. Nevertheless, Defendant did suspend Ms. Harris' license pursuant to the challenged law.  Plaintiffs establish not only the substantial and irreparable harm to Ms. Harris normally accompanying an unconstitutional deprivation, but imminent and irreparable consequences to her of not being able to drive.  Defendant's revocation of Ms. Harris' license interferes with her ability to obtain regular needed medical care.  Plaintiffs also show that the loss of a driver's license in Michigan makes it difficult for individuals to find and retain employment.

The harm Michigan's revocation scheme poses to Ms. Harris and other Michigan drivers unable to pay their traffic debt outweighs any harm that the issuance of a preliminary injunction will cause others.  The Court recognizes the State's "interest in having and enforcing its Motor Vehicle Code."  (Def.'s Resp. Br. at 24, ECF No. 11 at Pg ID 138.)  Nevertheless, the State's interests are not furthered by a driver's license revocation scheme that neither considers an individual's ability to pay his or her traffic debt nor informs individuals of the

opportunity to respond to a traffic citation, plead indigency, and seek an alternative to full payment of that debt.

The current law does not encourage Michigan drivers unable to pay their traffic debt to abide by the traffic laws or respond to traffic citations. Even if Michigan drivers are aware that the failure to pay their traffic debt results in the suspension of their license, they undoubtedly do not have that in mind when operating vehicles on the roadways. Unable to pay their traffic debt in full and informed that this is the only option available, indigent drivers have no incentive to appear in court or otherwise respond to their traffic citations. The current law instead discourages indigent drivers from responding to citations and makes it less likely that they will ever repay their traffic debt. The State's and public's interests may in fact be served by an injunction, as restoring the driver's licenses of individuals unable to pay their traffic debt may enable them to obtain and retain employment, which will make them more likely to pay that debt. It is noteworthy that an injunction would not prevent Michigan from continuing to enforce its driver's license revocation scheme to encourage the collection of traffic debt from individuals able to pay.

## VI. Conclusion

For the reasons discussed, the Court finds it unlikely that Plaintiffs will succeed in establishing that Michigan's scheme for suspending driver's licenses

violates equal protection or substantive due process.  Plaintiffs also are not likely to succeed in showing that the law infringes on a fundamental right or discriminates against individuals based on a suspect class.

The Court, however, finds a strong likelihood that Plaintiffs will show that the law violates procedural due process.  The aforementioned remaining factors relevant to whether a preliminary injunction should be issued also favor the issuance of an injunction.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for preliminary injunction is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant is enjoined from enforcing Michigan Compiled Laws § 257.321a to suspend the driver's licenses of people unable to pay their traffic debt.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 14, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, December 14, 2017, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager